MARC J. FAGEL (Admitted to Cal. bar)
MICHAEL S. DICKE (Admitted to Cal. bar)
TRACY L. DAVIS (Admitted to Cal. bar)
    davistl@sec.gov
SUSAN L. LAMARCA (Admitted to Cal. bar)
    lamarcas@sec.gov
DAVID A. BERMAN (Admitted to N.Y. bar)
    bermand@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, 26th Floor
San Francisco, California  94104
Telephone:  (415) 705-2500
Facsimile:   (415) 705-2501

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

### SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>ALTERNATE ENERGY HOLDINGS, INC.,<br>DONALD L. GILLISPIE, and JENNIFER<br>RANSOM,<br><br>        Defendants,<br><br>    and<br><br>BOSCO FINANCIAL, LLC, and ENERGY<br>EXECUTIVE CONSULTING, LLC,<br><br>        Relief Defendants. | Case No.  1:10-cv-621-EJL-REB<br><br>**AMENDED COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.        This matter involves a scheme to manipulate the market for Alternate Energy Holdings Inc.'s ("AEHI") stock and defraud individuals who purchased the company's stock. AEHI is a development stage company that purportedly plans to develop a nuclear reactor in Payette County, Idaho.  AEHI and Gillispie have raised millions of dollars from individual investors in Idaho, elsewhere in the U.S., and Asia in illegal unregistered transactions, and by making misleading statements about the viability of AEHI, which has no realistic possibility of building a multi-billion dollar nuclear reactor.  AEHI has never had any revenue or product. Beginning in 2006, Defendants engaged in a scheme to pump up the price and volume of AEHI's stock to artificially high levels through false press releases and promoters, and subsequently dump the stock through secret sales made by other entities and individuals connected to AEHI. The scheme was carried out by Defendant Donald L. Gillispie, founder and CEO of AEHI, and Defendant Jennifer Ransom, Senior Vice-President of Administration and Secretary of AEHI.

2.        Gillispie's scheme had two components: promoters and press releases.  Starting when AEHI went public in September 2006, Gillispie engaged promoters to persuade individual investors to buy restricted stock.  Additionally, Gillispie encouraged promoters to enter sale orders at the end of certain trading days in order to increase AEHI stock's price and volume to artificially high levels.  Gillispie also caused AEHI to issue a series of press releases that touted AEHI stock.  Gillispie knew that some of the press releases were false and misleading.  For example, AEHI press releases falsely stated that no officer had sold stock.  In reality, AEHI Senior Vice-President of Administration Jennifer Ransom had sold at least one million shares. She hid her stock sales from AEHI investors and the public, failing to file forms notifying the Commission of her sales.  In addition, Gillispie himself directed sales of more than one million shares of AEHI stock through nominees, thereby hiding from the public his conduct.  Proceeds of those sales went to Gillispie, who spent the money on lavish personal expenses such as his Maserati sports car.

2

3.     Defendants AEHI, Gillispie and Ransom have violated, and continue to violate, the antifraud provisions of the federal securities laws in connection with the purchase or sale of securities.  In addition to the emergency relief requested by the Commission in its *Ex Parte* Application for a Temporary Restraining Order filed concurrently with the complaint, the Commission seeks an order preliminarily and permanently enjoining them from further conduct that violates the securities laws and requiring them to disgorge their ill-gotten gains, with prejudgment interest.  The Commission also seeks an order requiring Defendants to pay civil money penalties.  The Commission further seeks an order prohibiting Gillispie from serving as an officer or director of any public company in addition to an order prohibiting Gillispie and Ransom from participating in any offering of penny stock.

4.     In addition to the emergency relief requested by the Commission in its *Ex Parte* Application for a Temporary Restraining Order, the Commission further seeks disgorgement of all ill gotten gains disbursed to Relief Defendants Bosco Financial, LLC and Energy Executive Consulting, LLC.

## JURISDICTION

5.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].  Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

7.     Venue is proper in the District of Idaho pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  During the period described in this complaint, AEHI had its principal place of business in this district and

Defendants Gillispie and Ransom resided in this district. In addition, acts, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this district.

## INTRADISTRICT ASSIGNMENT

8.      Assignment to the Southern Division is appropriate pursuant to Local Civil Rule 3.1 because a substantial part of the events and omissions giving rise to the Commission's claims occurred, among other places, in Ada County.

## DEFENDANTS

9.      **Alternate Energy Holdings, Inc.** was founded by Donald L. Gillispie and incorporated in Nevada in 2001, with its principal place of business in Eagle, Idaho. The company went public in September 2006 as a result of a reverse merger, and registered its securities under Section 12(g) of the Exchange Act on October 8, 2008. AEHI's stock is quoted on the OTC Bulletin Board and on the Pink Sheets operated by Pink OTC Markets Inc. It is a development stage company that is purportedly planning to build a nuclear power plant in Payette County, Idaho. The Commission has suspended trading in the stock of AEHI pursuant to Section 12(k) of the Exchange Act.

10.     **Donald L. Gillispie,** age 67, has been President, CEO, and Chairman of AEHI at least since the company went public in 2006. During the relevant period, Gillispie resided in Thaxton, Virgina, and Eagle, Idaho.

11.     **Jennifer Ransom,** age 36, has been Senior Vice-President of Administration and Secretary for AEHI since at least 2008. She also has a personal relationship with Donald Gillispie and is the beneficiary of his IRA account. During the relevant period, Ransom resided in Star, Idaho.

## RELIEF DEFENDANTS

12.     **Bosco Financial, LLC ("Bosco")** is an Idaho limited liability company based in Boise, Idaho, of which 99.99% is owned by Jennifer Ransom and .01% is owned by Ransom's

attorney, Brian L. Webb.  Bosco received financial distributions to which it was not entitled.

Bosco is named as a Relief Defendant in this action for the purpose of assuring complete relief.

13.     **Energy Executive Consulting, LLC ("Energy Executive")** is an Idaho limited

liability company based in Eagle, Idaho, and owned by Donald L. Gillispie.  Energy Executive

received financial distributions to which it was not entitled.  Energy Executive is named as a

Relief Defendant in this action for the purpose of assuring complete relief.

## FACTUAL ALLEGATIONS

### A.     Gillispie Forms AEHI and Takes It Public

14.     AEHI's predecessor was incorporated in 2001 in the state of Nevada.  In 2006,

Gillispie renamed the company "AEHI" and took it public through a reverse merger.  Although

Gillispie initially ran the company out of his home in Thaxton, Virginia, in approximately 2007,

he moved the company's headquarters to Eagle, Idaho.

### B.     Gillispie and AEHI Raise Millions of Dollars From Investors Through Public Solicitations

15.     From at least October 2006, AEHI and Gillispie engaged in a continuous plan to

raise money by offering and selling AEHI stock directly to the public. This offering was not

registered with the Commission.

16.     The principal method by which AEHI and Gillispie conducted their offering was

through mass e-mail distributions of offering documents called Private Placement Memoranda

("PPMs").  Typically, Gillispie would email the PPMs to a list of supporters, paid promoters and

finders and invite them, in turn, to forward the solicitation to potential investors.  Gillispie

included cover notes touting the offering as the "last chance" and the "lowest it will be" and

repeatedly (over four years) warned that investors should rush to buy stock from the company

before the company's "public offering" or "IPO."  These statements were false.  AEHI never

engaged in a "public offering" (aside from the unregistered offerings made pursuant to PPMs),

and could not have conducted an "IPO" or initial public offering because it was already a

publicly-traded company.  These false statements were made to induce unsophisticated investors into purchasing the company's stock.

17.     Some of the AEHI's promoters and finders were paid regular consulting fees for disseminating the PPMs.  Others were offered commissions for producing investors.  From at least November 2006 to September 2010, Gillispie also personally solicited investors through mass e-mail distributions, mailings to existing shareholders, fax blasts, and in-person investor presentations.

18.     In addition to Gillispie's false and misleading statements made in his cover emails, the PPMs also contained false and misleading statements, which are described in detail below.

19.     AEHI's PPMs also did not include important financial information about the company.  Specifically, the PPMs did not include audited financial statements or other information that would, among other things, inform investors as to the risk of the investment.

20.     The PPMs included an investor questionnaire that asked the prospective investor to "agree[] he is in accredited investor…"  The PPMs further stated that "[t]he purpose of this Questionnaire is to assure the Company that it may rely on certain exemptions from the registration requirements of the Securities Act…"  An individual investor may be "accredited" under the federal securities laws if, at the time of the investment, his net worth exceeds $1,000,000 or he regularly earns at least $200,000 annually.

21.     Despite sending the questionnaires, AEHI and Gillispie did not actually determine whether individuals were accredited or sophisticated when engaging in public solicitations, and instead offered and sold securities to unaccredited and/or unsophisticated investors.  The AEHI investor questionnaire did not seek key information about individual investors' salary or assets. In some cases, unaccredited and/or unsophisticated investors were invited to fill out the questionnaire and simultaneously return it to AEHI with cash.  In other cases, AEHI and Gillispie ignored the requirement that the investor questionnaire be completed and returned at all. In one example, after being solicited by an AEHI promoter, an individual with minimal assets

and no investing experience walked into AEHI's offices and purchased $4,400 worth of AEHI stock. This individual was not required to fill out a questionnaire.

22.     From October 2006 to October 2010, AEHI raised at least $14 million by selling securities to more than 850 investors in unregistered transactions. Purchasers in these transactions resided in at least 30 different states and at least three countries.

23.     AEHI has also issued more than 120 million shares of common stock to compensate employees, consultants, stock promoters and finders. The company has valued these shares at at more than $12 million. These transactions were also not registered with the Commission.

## C.     Despite AEHI's Weak Financial Condition, Defendants Promote AEHI

24.     Despite pitching many business ventures that the company planned to pursue over the past four years (including harvesting lightning; developing fuel additives to reduce natural gas production costs by 40 percent; and using nuclear-powered desalination reactors to provide the third world with clean water), AEHI has no meaningful revenue and describes itself as a development stage company. AEHI's promotional material claims that AEHI plans to pay the $10 billion cost of building the nuclear reactor "[w]ith capital raised from stock and direct investments." According to AEHI's Form 10-K for the fiscal year ended December 31, 2010, AEHI has "minimum liquid assets" and "and will be reliant upon stock and/or debt offerings to fund any kind of nuclear operations." The company took in more than $14 million through private placement offerings, yet according to its most recent Form 10-K filed with the Commission on April 6, 2011, AEHI had no revenue from inception to December 31, 2010 and had spent substantially all the cash it had raised from investors. The revenue that AEHI has recognized consists entirely of proceeds of the sales of two homes that it built under its "Energy Neutral" brand. AEHI stated in its 2010 10-K that the homes were sold for $447,000, but that one home was sold at an undisclosed loss and one was sold at a profit of approximately $7,500. Despite AEHI's weak financial condition, Gillispie stated in a November 12, 2010 interview that, in the long term, AEHI "could rival Exxon Mobil in profitability."

**D.**     **Gillispie Uses Promoters to Manipulate AEHI Trading Volume and Stock Price**

25.     Soon after AEHI became a public company in 2006, Gillispie engaged the services of stock promoters to find prospective investors for AEHI and to manipulate AEHI's stock price.  Gillispie offered promoters AEHI stock in exchange for their efforts.  Gillispie coached promoters on how to manipulate AEHI's stock price, instructing them to buy at the end of certain trading days to increase artificially the stock's price and trading volume.

26.     In 2009, Gillispie became frustrated with some promoters he retained because they were not buying enough AEHI stock to manipulate sufficiently AHEI's stock price.  Gillispie accused them of lying about whether they had bought AEHI stock at high prices as he instructed.  Gillispie also instructed them to buy larger increments of stock in order to affect the price.  He tried to incentivize the promoters to manipulate the stock more aggressively by offering them additional AEHI stock if they could get the stock price up to specific targets and keep the price there for a specified period of time.

27.     Gillispie encouraged further price manipulation in advance of meetings with wealthy potential investors in order to make the investment appear more attractive.  Gillispie's manipulation of AEHI's stock price also helped him raise money from the public pursuant to PPMs, because the artificially-inflated market price was higher than the direct offering price.  This artificial discount was a key component of Gillispie's pitch.  Gillispie's manipulation of AEHI's stock price allowed him to rake in more investor funds and, thus, to further perpetuate his scheme.

28.     Coupled with his use of false and misleading press releases, Gillispie's stock price manipulation also allowed him and Ransom to sell their AEHI shares at artificially inflated prices, further enriching themselves at the expense of investors.

**E.**     **Defendants Make Misrepresentations and Omissions, and Fail to File SEC Filings Disclosing Material Events**

29.     Defendants' offering fraud and stock price manipulation scheme were part of a larger effort by Defendants to mislead the public about AEHI's business.  While AEHI spent

investor money on undisclosed executive salaries and payments to stock promoters, it raked in investor funds and made misleading statements in a barrage of press releases claiming that it was a growing, multi-national business whose financial success was just around the corner.  This was false.

        **i.**    ***AEHI and Gillispie Misrepresent That No Officer Has Sold AEHI Stock***

       30.    Gillispie used press releases as a key part of his scheme to manipulate AEHI's stock price and volume.  AEHI has issued 166 press releases since it went public in September 2006, 87 of them since January 2010, despite the fact that the company has no revenue or meaningful operations.  Several press releases contain false and misleading statements.

       31.    On September 7, 2010, AEHI issued a press release claiming that "Based on confidence in AEHI's accomplishments and long term potential, company directors and line officers have maintained their stock ownership, in which **no shares have been sold since company inception.**"  (emphasis added).  On September 30, 2010, an AEHI press release quoted Donald Gillispie as stating: "Recent insider purchases and the fact that **neither I**, our CFO, board members, **nor any officers** who have day-to-day line responsibilities for running the company **have sold a single share since the Company's inception** speak to our strong confidence in the outlook for the business." (emphasis added).

       32.    Both statements are false.  AEHI's Senior Vice-President of Administration and Secretary Jennifer Ransom sold one million AEHI shares netting proceeds of $675,326.14 between June and September 2010.  As described below, Gillispie directed her sales.

       33.    Gillispie's tactics worked.  AEHI's average daily closing price for the month in April 2010 was $0.18 and average daily volume for the month was 262,905.  AEHI issued 11 press releases in May and during this time the daily average closing price for the month rose to $0.43 and monthly average volume rose to 894,950.  Ransom secretly sold her stock from June to September – with her last two September 2010 sales at $0.72 and $0.74 per share.

       34.    Ransom was both an officer of AEHI and a senior member of the company's management.  AEHI repeatedly referred to Ransom in its SEC filings as an "executive officer" of

AEHI, and identified her in other public statements as a "key member[] of the management team."  Ransom was the second-highest paid executive of AEHI, earning almost twice as much as the company's CFO in 2008 and almost three times as much as the CFO in 2009.  By the time that Gillispie said that no "officers who have day-to-day line responsibilities for running the company have sold a single share since the Company's inception," Ransom had been promoted to **President** of one of AEHI's subsidiaries, Energy Neutral.

35.     As an AEHI officer, Ransom was required to report her purchases and sales of AEHI stock made either directly or indirectly on her behalf, to the Commission, pursuant to Rule 16a-3 of the Exchange Act.  But Ransom failed to file any SEC Forms 3, 4, or 5 disclosing these sales, effectively keeping her sales secret from investors and the public.

36.     Defendants AEHI and Gillispie knew, or were reckless in not knowing, that their claims to investors and the public that no AEHI officers had sold stock were false and misleading.  Defendants' misrepresentations were material because, among other things, investors were misled into believing that AEHI's officers believed so strongly in the company's future that they had never sold AEHI stock.  Defendant Ransom knew or was reckless in not knowing that she substantially assisted AEHI's and Gillispie's misconduct by hiding her stock sales from the public and AEHI investors.

### ii.     *AEHI and Gillispie Misrepresent That Gillispie Has Not Sold AEHI Stock*

37.     The September 7 and September 30, 2010, press releases falsely stated that CEO Gillispie had not sold shares.  Although Gillispie has not sold shares held in his name, he sold stock through nominees Jennifer Ransom and AEHI attorney Brian Webb.  In 2010, Ransom sold at least one million AEHI shares, as set forth in paragraph 32 above.  Additionally, Gillispie sold shares through AEHI attorney Brian Webb.  In 2010, Webb sold at least 137,000 shares of AEHI stock.  Gillispie, Ransom, and Webb all had brokerage accounts located at the same firm and used the same broker.  Gillispie instructed the broker to sell stock for Ransom and Webb, including how and when to execute the trades.

38.     Gillispie enriched himself using the proceeds of these nominee sales.  Ransom transferred at least $200,000 of the $675,326.14 in proceeds from her sales of AEHI stock to Gillispie.  Ransom wrote a check to Bosco (her limited liability company) for the majority of the $200,000, but the check was deposited in Gillispie's Energy Executive bank account, which Gillispie uses for personal expenses, such as jewelry, cruises, and his Maserati sports car.   In addition, Gillispie, who had a personal relationship with Ransom and made her the beneficiary of his IRA account, had determined to pay down Ransom's debt.  Accordingly, when Gillispie directed sales of Ransom's AEHI stock holdings, he was benefiting himself.  Thus, Gillispie's statement that he never sold AEHI shares was false in light of his use of Ransom and Webb as his nominees for stock sales.

39.     As an AEHI officer, Gillispie was required to report his purchases and sales of AEHI stock made either directly or indirectly on his behalf, to the Commission, pursuant to Rule 16a-3 of the Exchange Act.  But Gillispie failed to file any Forms 3, 4, or 5 disclosing these sales, effectively keeping his sales secret from investors and the public.

40.     Defendants AEHI and Gillispie knew, or were reckless in not knowing, that their claims to investors and the public that Gillispie had not sold stock were false and misleading.  Defendants' misrepresentations were material because, among other things, investors were misled into believing that Gillispie believed so strongly in the AEHI's future that he never sold AEHI stock.  Defendant Ransom knew or was reckless in not knowing that she substantially assisted AEHI's and Gillispie's misconduct by transferring proceeds from her stock sales to Gillispie.

  **iii.**  ***AEHI and Gillispie Falsely State in Private Placement Memoranda and Elsewhere That They Have Funding***

41.     AEHI and Gillispie have repeatedly misled investors about the status of AEHI's funding.  Funding is a critical factor for investors because AEHI has claimed that it plans to pay the $10 billion cost of building a nuclear reactor "[w]ith capital raised from stock and direct investments."

42.     Since January 2009, AEHI has issued at least 25 PPMs.  PPMs are documents used by companies to solicit investors to purchase issuers' securities.  Several of these PPMs contained false statements about the status of AEHI's funding.

- AEHI's June 4, 2007 PPM stated that "The project has obtained $3.5 billion in funding."

- AEHI's November 30, 2007 PPM stated that "The project is funded and seeking N[uclear] R[egulatory] C[omission] approval."

- AEHI's December 1, 2008 PPM stated that "The project is funded and seeking N[uclear] R[egulatory] C[omission] approval."

- AEHI's January 13, 2009 PPM stated that "The project has funding arrangements and is seeking process approvals."

- Another version of AEHI's January 13, 2009 PPM, which Gillispie personally distributed on July 6, 2009, stated that "The project has funding commitments and is seeking process approvals."

- AEHI's February 13, 2009 PPM stated that "The project is funded and seeking N[uclear] R[egulatory] C[omission] approval."

- AEHI's March 31, 2009 PPM stated that "The project is funded and seeking N[uclear] R[egulatory] C[omission] approval."

43.     These statements in the PPMs were false.  The "project" was the purported development of a nuclear reactor in Idaho.  The company's Form-10K for fiscal year ended December 31, 2008 -- filed with the Commission on March 31, 2009 -- indicated that the company had no such funding:  "The Company may need to obtain loans to fund any amounts not funded by private placement subscriptions."  The Form 10-K described the company's financial condition as very weak and explained that AEHI "has minimum liquid assets" and "will be reliant upon stock offerings to fund any kind of nuclear operations."  The 10-K further stated that "The  monies  raised  by any  private  offering  may  not be  sufficient  for the continued proposed  operations of AEHI."   AEHI and Gillispie made material misrepresentations to potential investors when they wrote in PPMs, including those identified above, that they had funding.

44.     When faced with the false and misleading PPM dated March 31, 2009, Gillispie said in a sworn affidavit that the statement about funding was "nonsensical" and that the "document was altered without AEHI's knowledge or permission and was never disseminated by AEHI."  But Gillispie's sworn statement is also false, as Gillispie personally distributed the false and misleading PPM to potential investors on multiple occasions.  For example, in pitching AEHI's February 13, 2009 PPM, Gillispie wrote a cover email to potential investors stating that "we believe our nuclear rezone and funding will occur with [sic] the next 30 days or so lifting the stock even higher…"  Gillispie's email was inconsistent with the attached PPM, which stated that the project "is funded."  In any case, both statements were false, as the project was not funded and Gillispie had no reason to believe that AEHI would obtain funding within the next 30 days.

45.     AEHI and Gillispie knew or were reckless in not knowing that the statements in the PPMs concerning funding were false and misleading.

46.     AEHI and Gillispie made other false and misleading statements about the status of AEHI's funding.  As described above, Gillispie repeatedly urged potential investors to buy stock in private transactions because AEHI was about to do a "public offering."  Gillispie also told investors in a September 9, 2009 letter that "we are starting the process for our first public stock offering (IPO) for later this year."  These statements were false.  First, the company never did an "IPO" or any similar transaction.  Second, AEHI could not have done an "IPO" because it was already a publicly-traded company.

47.     AEHI and Gillispie also misled investors when they failed to disclose that the nuclear power plant could not be funded absent certain events which were distant and highly speculative.  Gillispie stated in a September 9, 2009 letter to investors that "we have a large energy trust that is willing to loan us up to $5 billion for the plant construction phase."  This statement omitted key facts and was misleading.  Gillispie himself later acknowledged that at the time he considered the interest rate on the proposed loan to be unacceptable, and that the

financing deal would not be available until AEHI had spent several years and hundreds of
millions of dollars (which it did not have) on various approvals.

48.     In his many statements in PPMs and elsewhere about AEHI's funding status,
Gillispie failed to disclose that he, himself, believed that funding would be contingent on at least
two future and uncertain events: AEHI's being approved for listing on a national stock exchange,
and the successful execution of a new public offering.  Gillispie wrote in a May 26, 2010 email
exchange that he knew that "[t]he Idaho project is contingent upon the offering we mentioned
which will occur after we move to a higher exchange."  In the same exchange he wrote that
"[t]he funds for the Idaho reactor project is [sic] coming from a separate offering in the future
and until we raise those funds the project would not be launched."

49.     Gillispie himself was ultimately responsible for the misleading claims in the
PPMs, and he adopted them in statements he made in distributing them.

50.     AEHI and Gillispie knew or were reckless in not knowing that their statements
and omissions about the status of AEHI's funding were false and misleading.

### iv.     *AEHI and Gillispie Falsely State Gillispie's 2009 Compensation*

51.     In its Form 10-K for the fiscal year ended December 31, 2009, signed and
certified by Gillispie, AEHI stated that Gillispie's cash compensation for 2009 was $133,000 that
"consisted of expense allotment for travel, auto, Idaho living expenses, entertainment."  AEHI
reported no other cash compensation to Gillispie for 2009.

52.      In reality, Gillispie pocketed these purported expense allotments while AEHI
separately paid his bills.  For example, Gillispie, a Virginia resident until 2009, set up automatic
debits from AEHI starting in 2008 so that the company would pay rent on a $3,000-per-month
house that he leased in Idaho.  Gillispie also submitted at least $143,456.15 in credit card bills
directly to AEHI for payment, and kept his expense allotment for those same expenses.  The bills
included charges for travel, food, and season tickets to football games.  Gillispie received at least
$55,000 of additional undisclosed cash from AEHI in 2009.

53.     In 2009, AEHI paid Gillispie and Energy Executive (Gillispie's LLC) at least $367,456.15 in cash and paid expenses – approximately $230,000 more than AEHI disclosed to the public.  Thus, AEHI and Gillispie understated Gillispie's compensation by approximately 64%.

54.     AEHI and Gillispie knew or were reckless in not knowing that their statements about Gillispie's compensation were false.

> **v.     *AEHI Fails To Disclose A Material Change in, And Then Falsely States, Gillispie's 2010 Compensation***

55.     AEHI did not provide any updated information to investors about Gillispie's compensation in 2010.  Gillispie's salary increased to at least $306,500 during 2010, because AEHI's board increased Gillispie's salary to $40,000 per month effective July 1, 2010.  In addition to his salary, AEHI paid Gillispie at least $102,950.98 for his rent and credit card bills.  Plus, Gillispie received at least $200,000 from Ransom after he directed her secret stock sales described above in paragraphs 37-38.  Gillispie's 2010 compensation from AEHI totaled at least $658,950.98 – a more than $525,000 increase over the 2009 figure released to shareholders.  Yet, AEHI failed to file a Form 8-K with the Commission or otherwise inform the public.

56.     In its Form 10-K for the fiscal year ended December 31, 2010, signed and certified by Gillispie, AEHI and Gillispie stated that Gillispie received cash compensation for 2010 was $393,000.  In a footnote to its Summary Executive Compensation Table, AEHI stated that Gillispie's cash compensation for 2010 was $344,000.  Each of these statements is false.  As described above, AEHI paid Gillispie more than $650,000 in 2010.

57.     AEHI and Gillispie knew or were reckless in not knowing that their statements about Gillispie's compensation were false.

> **vi.     *AEHI and Gillispie Falsely State Ransom's 2009 Compensation***

58.     In its Form 10-K for the fiscal year ended December 31, 2009, signed and certified by Gillispie, AEHI stated that Ransom's cash compensation for 2009 was $130,000 for

"expense allotment, travel, auto and entertainment."  AEHI reported no other cash compensation to Ransom for 2009.

59.     In reality, like Gillispie, Ransom kept the cash that was given to her as "expense allotment" while AEHI paid $62,502 to her credit cards for those same expenses.

60.     In 2009, AEHI paid Ransom at least $191,028 in cash and paid expenses.

61.     AEHI and Gillispie knew or were reckless in not knowing that their statements about Ransom's compensation were false.  Ransom knew or was reckless in not knowing that that she substantially assisted AEHI's and Gillispie's misconduct by submitting expenses for reimbursement that were already covered by her purported "expense allotment."

### vii.     *AEHI and Gillispie Fail to Disclose Ransom's 2010 Compensation*

62.     During 2010, Ransom's compensation increased to at least $323,747, which was substantially beyond the $130,000 that had previously been disclosed to investors.  Her compensation consisted of $136,000 in cash paid to Bosco, her consulting company, plus $187,747 in payments by AEHI to Ransom's credit cards for the same expenses that were covered by her "expense allotment."  As such, Ransom's 2010 compensation was more than *double* what had previously been disclosed to investors.

63.     However, in its Form 10-K for the fiscal year ended December 31, 2010, signed and certified by Gillispie, AEHI made no disclosure whatsoever about Ransom's 2010 compensation.

64.     AEHI and Gillispie knew or were reckless in not knowing that their statements about Ransom's compensation were false.  Ransom knew or was reckless in not knowing that that she substantially assisted AEHI's and Gillispie's misconduct by submitting expenses for reimbursement that were already covered by her purported "expense allotment."

### viii.    *AEHI Falsely States That A Promoter Was Not Paid for Touting AEHI Stock*

65.     On October 14, 2010, AEHI issued a press release announcing that Pinnacle Digest "vetted" and "recommended" AEHI stock.  Pinnacle holds itself out as an exclusive

online financial newsletter for investors.  The release stated that "Pinnacle Digest was not paid or compensated by AEHI in any way for writing the article."

66.    This statement was false.  Pinnacle's website disclosed that it had been paid to display and disseminate AEHI news.

67.    In fact, Pinnacle's President was a paid promoter for AEHI.  In a May 27, 2010 email, Gillispie said about Pinnacle's President that "he does our stock promotion in Canada." In the months leading up to Pinnacle's October 14, 2010 article touting AEHI, AEHI sold Pinnacle's President 170,000 shares of its common stock at a quarter of the market price, or less. Pinnacle's President bought an additional 2,500 shares of AEHI common stock on October 14, 2010 – the very same day that he published his article touting AEHI stock – which he sold a week later.

68.    Defendants AEHI and Gillispie knew, or were reckless in not knowing, that their claims to investors and the public about payment to promoters were false and misleading.

### ix.    *AEHI and Gillispie Mislead Investors About AEHI's Employees*

69.    In its Form 10-K for the fiscal year ended December 31, 2009, signed and certified by Gillispie, AEHI stated that "The Company and its subsidiaries have 15 full-time employees.  In addition, nine officers and directors provide certain services dedicated to current corporate and business development activities."  This statement was false and misleading in at least two respects.

70.    First, during the period when this statement was made, according to Gillispie, AEHI did not have a single full-time employee.  Instead, AEHI engaged the services of independent contractors who billed AEHI for their time with invoices on a month-by-month basis.

71.    Further, even counting independent contractors, AEHI had less than half of the work force that it claimed.   In fact, as of the date that AEHI filed its 2009 10-K, AEHI had at most *seven* individuals, and possibly fewer, who were working regular hours for the company as independent contractors.

72.     Defendants AEHI and Gillispie knew, or were reckless in not knowing, that their claims to investors and the public about AEHI's "employees," were false and misleading.

### x.     *AEHI and Gillispie Mislead Investors About AEHI's Offices and Subsidiaries*

73.     AEHI and Gillispie have stated to investors and the public that AEHI has offices in Beijing, China; Seoul, Korea; and Lagos, Nigeria.  For example, in a June 18, 2009 press release AEHI stated that:

> AEHI will open an office in the Chaoyang District, central business district, of Beijing [China] in July to facilitate institutional investors for AEHI projects and joint ventures with Asian companies for nuclear plant components and other energy-related projects with US companies.  Nancy Shi will be the President of AEHI China reporting to AEHI Chairman and CEO, Don Gillispie, in the US.

In a September 9, 2009 letter to investors, Gillispie wrote that "In July, we opened an office in Beijing, China…"  In a May 2010 AEHI newsletter to investors, AEHI listed offices in Eagle, Idaho, Beijing, China and Seoul, South Korea.  In that same newsletter, Gillispie began his "Notes from the CEO" by writing: "Greetings from our China office..."  In AEHI's PPM the Company specifically listed "AEHI China, Ltd." and "AEHI Korea" along with its other subsidiaries under the heading "Business of the Company."  These statements are false or misleading.

74.     AEHI has disclaimed any control over AEHI China, Ltd. or its President, Nancy Shi.  According to Gillispie, AEHI decided not to open its own independent China office because it was too costly.  Instead, according to Gillispie, AEHI China, Ltd. was set up by Shi as a separate entity substantially all of which she owns along with other Chinese investors.  According to Gillispie, AEHI asked these investors to create AEHI China, Ltd. in the hope that AEHI would one day receive a share of revenues from the business they operated; however, no such revenue has been generated.  According to Gillispie, AEHI has a similar relationship, lacking control, with AEHI Korea.

75.     AEHI and Gillispie also misled investors about the business of its subsidiary, Energy Neutral.  In AEHI's May 2010 investor newsletter, Gillispie announced that "…a number of people even began ordering new Energy Neutral homes.  We will begin to franchise Energy Neutral around the country this summer."  This statement was false.  No one had ever ordered an Energy Neutral home, and AEHI made no meaningful effort to franchise Energy Neutral.

76.     Defendants AEHI and Gillispie knew, or were reckless in not knowing, that their claims to investors and the public about AEHI's purported international offices and subsidiaries were false and misleading.

### xi.     *AEHI and Gillispie Mislead Investors and the Public with Press Releases*

77.     AEHI and Gillispie routinely used press releases to mislead the market about AEHI's purported progress towards its goals.

78.     In a January 4, 2010 press release, AEHI stated that "Don Gillispie, AEHI's CEO, left today for Seoul to finalize negotiations with Korean Electric Power Company, KEPCO, to import the South Korean's advanced reactor, APR 1400, for its Idaho and Colorado sites." AEHI had no agreement with KEPCO that it could "finalize," and had not obtained local or federal approvals for the construction of nuclear power plants in Idaho or Colorado.

79.     In a March 24, 2010 press release, AEHI stated that "The Nuclear Regulatory Commission has officially recognized AEHI's proposal to build a nuclear power plant in Payette County, Idaho."  AEHI had not obtained any approval from the Nuclear Regulatory Commission. Rather, the Nuclear Regulatory Commission had simply acknowledged that AEHI had applied for such approval.

80.     In the summer of 2010, AEHI ramped up its promotional activity, flooding the market with press releases that were non-substantive, duplicative and, in some cases, misleading. A number of these press releases related to AEHI's new venture entitled "Green World Water." For example:

- In a May 18, 2010 press release, AEHI announced "the company's official partnership through AEHI China with China National Nuclear Corporation…to produce and market nuclear desalinization reactors at the international level. The product will be the largest, cleanest, most efficient, most cost-effective converter of salt water to drinking water on the market and will be available to order in the summer of 2010."

- In a June 29, 2010 press release, AEHI announced that Green World Water "has developed the world's first commercially available and competitively-priced nuclear desalination reactor that can produce clean water from the ocean and electricity simultaneously, including pumping the water hundreds of miles inland."

- In a July 22, 2010 press release, AEHI announced the launch of a website for Green World Water, which it said "will be used to promote and sell commercial Green World Water(TM) nuclear desalination systems, some of which are poised to sell before the end of the year."

- In an August 12, 2010 press release, AEHI announced that Green World Water had signed a "Negotiation Agreement" with Tubestar Oil.

Neither AEHI nor Green World Water had ever built or sold a desalination reactor and they had no contracts to do so. To the extent that Green World Water had entered any "agreements," they were non-binding or contingent on the occurrence of distant and speculative events.

81.     Defendants AEHI and Gillispie knew, or were reckless in not knowing, that their press releases omitted key facts and were misleading.

**F.     AEHI Continues to Issue New Press Releases**

82.     On or around September 22, 2010, after raising the issue with Gillispie and company management, AEHI's securities lawyers and investor relations firm resigned over their concerns about the volume and nature of AEHI's press releases.

83.     Following these resignations, AEHI continued to issue a new press release almost every business day, including on October 4, 11, 14, 15, 18, 19, 25, 27, 28; November 1, 2, 8, 9, 11, 15, 17, 22, 29; and December 1, 2, 3, 6, 10, and 13, 2010. On December 6, 2010, a promotional fax purporting to originate from AEHI provided contact information for those seeking to invest in AEHI, noting that investors had the option of purchasing the company's publicly traded stock or making multi-million-dollar direct investments in the company, and

quoting Gillispie extolling nuclear power as "a tremendous investment opportunity with excellent return potential." From November 30 to December 7, the daily trading volume of AEHI stock doubled, rising from 357,500 to 841,900 shares.

### G. AEHI Has Raised Millions of Dollars from Investors While Issuing Press Releases and Touting Its Stock Through Promoters

84.    As set forth in paragraph 30 above, AEHI issued 166 press releases between the time it went public in September 2006 and October 16, 2010, 87 of them since January 2010, despite the fact that the company has no meaningful revenue or operations. Several press releases contain false and misleading statements. AEHI has also aggressively used promoters to tout its stock, including on the internet. In an October 14, 2010 email, AEHI's public relations director circulated an article about AEHI from the website "steroidstocks.com" and said: "These are our web guys at work. They are now making about 15 posts per day per site and when we see days of increase they will also post articles about us on their websites and in investor newsletters." Gillispie's scheme to manipulate the market is working. In 2010, investors invested at least $5 million in AEHI.

### H.  The Commission Suspends Trading of AEHI Stock

85.    On December 14, 2010, the Commission suspended the trading of AEHI stock pursuant to Section 12(k) of the Exchange Act which grants the Commission emergency authority to suspend the trading of any security where the Commission believes suspension is in the public interest and will protect investors.

### <u>FIRST CLAIM FOR RELIEF</u>

### (Violations of Section 17(a) of the Securities Act by Defendants AEHI and Gillispie)

86.    Paragraph numbers 1 through 85 are re-alleged and incorporated herein by reference.

87.     Defendants AEHI and Gillispie have, by engaging in the conduct set forth above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails:  (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

88.     By reason of the foregoing, Defendants AEHI and Gillispie have directly or indirectly violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and unless enjoined will continue to violate this provision.

## SECOND CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 By Defendants AEHI and Gillispie)

89.     Paragraph numbers 1 through 85 are re-alleged and incorporated herein by reference.

90.     Defendants AEHI and Gillispie, by engaging in the conduct set forth above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in connection with the purchase or sale of securities.

91.     By reason of the foregoing, Defendants AEHI and Gillispie have directly or indirectly violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17

C.F.R. §§ 240.10b-5] thereunder and unless restrained and enjoined will continue to violate these provisions.

## THIRD CLAIM FOR RELIEF

### (Violations of Section 13(a) of the Exchange Act and Rule 13a-11 By AEHI)

92.     Paragraph numbers 1 through 85 are re-alleged and incorporated herein by reference.

93.     Defendant AEHI, by engaging in the conduct set forth above, violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-11 thereunder [17 C.F.R. § 240.13a-11], which obligate issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file with the Commission accurate reports of significant events within four days of the event.

94.     By reason of the foregoing, Defendants AEHI has directly or indirectly violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-11 thereunder [17 C.F.R. § 240.13a-11] thereunder and unless restrained and enjoined will continue to violate these provisions.

## FOURTH CLAIM FOR RELIEF

### (Aiding and Abetting Violations of 10(b) of the Exchange Act and Rule 10b-5 By Defendants Gillispie and Ransom)

95.     Paragraph numbers 1 through 85 are re-alleged and incorporated herein by reference.

96.     Gillispie and Ransom knowingly provided substantial assistance to AEHI's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], and therefore are liable as aiders and abettors.  Unless restrained and enjoined, they will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder.

## FIFTH CLAIM FOR RELIEF

**(Violations of Section 16(a) of the Exchange Act and Rule 16a-3
By Defendants Gillispie and Ransom)**

97.     Paragraph numbers 1 through 85 are re-alleged and incorporated herein by reference.

98.     Defendant Gillispie has been an officer of AEHI in his capacity as CEO, President, and Chairman of AEHI since at least 2006.  Defendant Ransom has been an officer of AEHI in her capacity as Senior Vice-President of Administration and Secretary for AEHI since at least 2008.

99.     By engaging in the conduct described above, Gillispie and Ransom failed to file statements accurately reflecting changes in their beneficial ownership of AEHI's common stock and annual statements accurately reflecting their beneficial ownership of AEHI's common stock. By reason of the foregoing, Gillispie and Ransom violated and, unless restrained and enjoined, will continue to violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

## SIXTH CLAIM FOR RELIEF

**(Violations of Sections 5(a) and 5(c) of the Securities Act
By Defendants AEHI and Gillispie)**

100.    Paragraph numbers 1 through 85 are re-alleged and incorporated herein by reference.

101.    During the relevant period, Defendants AEHI and Gillispie, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities through the use or medium of a prospectus or otherwise when no valid registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

102.    Defendants AEHI and Gillispie engaged in or participated in the unlawful distribution of AEHI securities as described above.

103.    By reason of the foregoing, Defendants AEHI and Gillispie, directly or indirectly, violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77 e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enjoin Defendants AEHI and Gillispie from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Enjoin Defendant AEHI from directly or indirectly violating Section Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-11 thereunder [17 C.F.R. § 240.13a-11].

### III.

Enjoin Defendants Gillispie and Ransom from aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### IV.

Enjoin Defendants Gillispie and Ransom from directly or indirectly violating Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)].

### V.

Enjoin Defendants AEHI and Gillispie from directly or indirectly violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77 e(c)].

### VI.

Enter an order barring Gillispie from serving as an officer or director of any public company, pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

### VII.

Enter an order barring Gillispie and Ransom from participating in an offering of penny

stock, pursuant to Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

VIII.

Enter an order freezing the assets of Defendants AEHI, Gillispie, and Ransom, and Relief Defendants Energy Executive and Bosco.

IX.

Enter an order for Defendants and Relief Defendants to provide a verified accounting identifying (i) the location and disposition of all funds received from investors; (ii) the location and disposition of all accounts controlled by Defendants or held for their benefit; and (iii) the location and value of all investor assets, as well as personal or other assets currently held by Defendants, or under their control or over which they may exercise actual or apparent authority.

X.

Issue an order requiring Defendants and Relief Defendants to disgorge their ill-gotten gains according to proof, plus prejudgment interest thereon.

XI.

Issue an order requiring Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

XII.

Enter an order preventing Defendants and Relief from destroying, mutilating, concealing, transferring, altering, or otherwise disposing of, in any manner, books, records, computer programs, computer files, computer printouts, correspondence, including e-mail, whether stored electronically or in hard-copy, memoranda, brochures, or any other documents of any kind that pertain in any manner to the business of the Defendants and Relief Defendants.

XIII.

Enter an order permitting expedited discovery.

25

**XIV.**

Enter an order temporarily freezing the assets of Defendants AEHI, Gillispie and Ransom and Relief Defendants Bosco and Executive Energy Consulting.

**XV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**XVI.**

Grant such other and further relief as this Court may determine to be just, equitable, and necessary.

Dated:  July 29, 2011                              Respectfully submitted,


                                                   /s/ David Berman_____
                                                   David A. Berman
                                                   Attorney for Plaintiff
                                                   SECURITIES AND EXCHANGE COMMISSION